HENRY REITH, Respondent, v. JOHN C. LULLMANN,
ADMINISTRATOR, Appellant.

December 6, 1881.

1. A new promise to pay a debt discharged in bankruptcy must be a distinct,
unequivocal promise to pay.

2. Where the discharged debtor, upon presentment of the claim by the
creditor's collector, says: "Tell Harry [the creditor] to come down and
I'll pay him," this is a promise sufficient to support an action.

3. That the collector presented the note to the discharged debtor for payment
in pursuance of a request from the creditor's wife, instead of the creditor
himself, is immaterial.

4. A prior oral promise to pay a debt discharged in bankruptcy does not affect
the creditor's right to sue upon a second promise, made before the original
debt is barred by the statute of limitations.

APPEAL from the St. Louis Circuit Court, ADAMS, J.
*Affirmed.*

TAYLOR & POLLARD, with MARTIN & LACKLAND, for the
appellant.

R. M. NICHOLS, for the respondent.

THOMPSON, J., delivered the opinion of the court.

The plaintiff preferred, in the probate court of the city of
St. Louis, a claim against the estate of George C. Miller,
deceased, evidenced by two certificates of deposit. The
following is a copy of one of them; and the other is exactly
the same, except that the time to run is eight, instead of
six, years: —

"$197.34.        BANKING-HOUSE OF MILLER & KARST,
                "ST. LOUIS, Mo., September 30, 1865.

"Henry Reith has deposited with us one hundred and
ninety-seven and thirty-four one-hundredths dollars, pay-
able to the order of himself on return of this certificate, six
years after date, with interest at the rate of no per cent
per annum.

[U. S. stamp.]        [Signed]   MILLER & KARST."

The probate court allowed the claim, and the administrator appealed to the circuit court, where judgment was again given for the plaintiff.

It appeared in evidence in the circuit court, that George C. Miller was discharged in bankruptcy on July 9, 1868, from all his debts which had accrued prior to the year 1867. The plaintiff, to avoid the effect of this discharge, introduced evidence that Miller had made two distinct promises to pay the debt evidenced by these certificates, once in 1871, and again in 1877. The promise shown to have been made in 1871, must be left out of the question, because it was an oral promise, and, under the rule laid down by this court in *Fleming* v. *Lullman* (*ante*, p. 104), was barred by the statute of limitations of five years, and hence could not constitute the foundation of a recovery.

The only testimony tending to show a promise to pay the debt in the year 1877, was that of R. A. Howard, who testified that he boarded at the house of the plaintiff and worked for Dr. McLean in that year; that Mrs. Reith gave him the two certificates in question, and requested him to collect them of Miller, promising to pay him well if he should succeed in doing so; that he presented the certificates to Miller at the McLean Building in St. Louis, and Miller said: " Tell Harry to come down and I will pay him ; " that this was the exact language he used, and that the witness never spoke to him about the matter at any other time.

The claim was exhibited for payment in the probate court within five years of the time when this second promise was made ; and the only question, therefore, is, whether this was such a promise to pay a barred debt as will support an action against the promisor or his representative. It is not questioned that a promise to pay a debt which has been barred by limitation or discharged in bankruptcy, must, in order to furnish a sufficient foundation for an action, be a

distinct and unequivocal promise or undertaking to pay. *Cambridge* v. *Littlefield*, 6 Cush. 213; *Allen* v. *Ferguson*, 18 Wall. 3; *Egbert* v. *McMichael*, 9 B. Mon. 45; *Fleming* v. *Hayne*, 1 Stark. 370; *Mosely* v. *Caldwell*, 59 Tenn. 208; *Shockey* v. *Mills*, 71 Ind. 292; *Randige* v. *Lyman*, 124 Mass. —. A mere expression of an intention (*Stewart* v. *Reckless*, 24 N. J. L. 429), or an admission of the debt under circumstances which show a willingness to pay it (*Underwood* v. *Eastman*, 18 N. H. 585), is not enough. Neither is it questioned that, if there is a promise to pay depending upon a future contingency, or coupled with a condition, it must be shown that the contingency has happened, or that the condition has been performed. *Bank* v. *Boykin*, 9 Ala. 322. The objection made by the defendant to the promise shown in evidence in this case is, that it was not an unconditional promise, but that it was a promise based upon the condition that the plaintiff should come down to the defendant's office or place of business, to get his money. We think this objection is too refined. The condition of the plaintiff coming down to the office of the deceased to get his money was in itself of little importance. It was merely a statement made to postpone immediate payment and avoid the pressure or annoyance of a dun; or, possibly, because the decedent may have doubted the right of Howard to collect the debt. "Tell Harry [meaning the plaintiff] to come down and I will pay him," in our judgment imported an unconditional promise to pay the plaintiff whenever he should make demand in person. If the making of a demand by the plaintiff in person is to be deemed a condition upon which this promise was based, then that condition has been fulfilled by the act of the plaintiff in preferring the debt as a claim against the estate of the debtor.

The judgment of the circuit court is accordingly affirmed. Judge BAKEWELL concurs; Judge LEWIS is absent.

THOMPSON, J., delivered the opinion of the court upon a motion for a rehearing.

A motion for rehearing filed in this case asks our attention to two questions which were not discussed at large in the opinion, though they were carefully considered by us before the opinion was rendered. These questions are, first, that Mr. Howard, to whom the promise was made by Miller in 1877, to pay the debt, was not, at the time, acting as the agent of the plaintiff. We did not and do not feel any difficulty on this point. He had possession of the evidences of the prior indebtedness to the plaintiff. He had them in pursuance of a request of the plaintiff's wife, that he should endeavor to collect the debt. He lived at the plaintiff's house at the time. The plaintiff stands here in the attitude of affirming and adopting the act of his wife in constituting him his agent. The rule that a wife cannot appoint an agent to contract for *her* except in those cases where she can contract for herself, is not questioned ; for what she cannot do by herself she cannot do by another. The principle that an agent cannot delegate his authority unless he is empowered by his principal to delegate it, is not questioned. But this principle has its reasonable limitations ; and the power of an agent to delegate an authority, will frequently be implied from the ordinary course of business or of human action. For instance, it would startle the business community if a court of justice were to hold that, when a merchant places in the hands of his banker a foreign bill of exchange for collection, he does not impliedly authorize the banker to make use of the ordinary agencies by which such bills are collected, such as the mails and its correspondents at or most convenient to the place upon which the bill is drawn. It would equally be a strange rule if an attorney, when a note is placed in his hands for collection, could not demand and receive payment through his clerk or office-boy. There would be just as little sense in holding that, where a man leaves an evidence

of debt with his wife for collection, she cannot make use of the ordinary agencies for collecting it. The sound distinction is believed to be this : If a person delegates to another the power to do a particular act, where, from the nature of the act to be done, or from the relation of the parties or other surrounding circumstances, there is an implication that the authority is given by reason of trust or confidence in the capacity of the particular person to perform the act, the person to whom the power is delegated, cannot delegate it to another so as to bind his principal without express authority so to do. But where a person appoints another to do an act which, in the usual course of business, or human action, would not be done by that other in person, but would be committed by him to such agencies as he might see fit to employ, then there is an implied authority in him to make use of such agencies. In such cases, the ultimate agents thus made use of are for some purposes deemed to be the agents of the principal agent or undertaker only, as in case of an independent contractor who undertakes to build a house, using his own methods and employing his own servants ; while for other purposes they would be treated as the agents of the first principal. Thus, if A. sues out a malicious attachment against the property of B., acting through his attorney, and the attorney employs the clerk to issue the writ, the sheriff to execute it, and the sheriff designates his deputy to perform this last act, the original plaintiff is liable to the defendant in the attachment suit for the trespass, although it has been performed by several intermediate agencies. The deputy sheriff who levied the attachment is, in such a case, his agent. And so, by parity of reasoning, was Howard the plaintiff's agent in this case. The plaintiff in the malicious attachment suit, never contemplated that his attorney should make the levy in person. The plaintiff in this suit, in giving these certificates to his wife to collect, cannot be supposed to have intended that she should go to the place of business of Miller and demand

payment in person. If Miller had paid Howard, and Howard had never delivered the money to the plaintiff, we have no doubt that it would have been a good payment, exonerating Miller from any legal obligation to the plaintiff, even if there had been such an obligation.

But, conceding that Howard was not the plaintiff's agent for the purpose of receiving the new promise to pay, there is no difficulty in holding that he was Miller's agent for the purpose of communicating the promise to the plaintiff. He presented the certificate of deposit to Miller and requested payment. Miller told him to tell the plaintiff to come down and he would pay him. This is not in any sense a loose declaration of an intent to pay, made to a stranger. It was a dispositive statement, made to Howard for the purpose of having Howard communicate it to the plaintiff, which Howard must have done, or the plaintiff would not have had the knowledge which enabled him to avail himself of Howard's testimony. The reason why a promise made to a stranger will not revive such debt is, that such promise is not at all in the nature of a contract. It is simply an expression of a mental intention or disposition not made with the direct intent that it shall be communicated to the creditor and that the creditor shall accept it or act upon it. *Underwood* v. *Eastman*, 18 N. H. 585 ; *Mosely* v. *Caldwell*, 59 Tenn. 209. But this rule has no application to a case where a promise is made to an intermediary, who holds in his hands the particular evidences of debt in relation to which the promise is made, which he is endeavoring to collect at the time for the owner of them, and which promise is made to him with the intent on the part of the promisor that he shall communicate it to the owner, which he does.

Another point, as we gather it from the brief of the learned counsel, is, that the unequivocal promise to pay the debt which Miller made in 1871, by raising a new and independent cause of action, absorbed in such a way the original

cause of action that it thereby became wholly extinguished. Hence, as this new promise was barred by the statute of limitations of five years at the time the promise of 1877 was made, which last promise was an oral promise merely, such as cannot, under our law, revive a debt barred by limitation, this last promise was incapable of furnishing the ground of an action. We do not agree to this view. The promise of 1877 was supported by the consideration of the moral obligation to pay the original indebtedness, the justness of which has never been questioned. This moral obligation was not lessened by the intermediate promise of 1871, but was rather strengthened by it. The position that, by reason of promising in 1871 to do what in good conscience he ought to have done, he put his creditor in a worse position than if he had not made the promise, is, it seems to us, quite metaphysical. The original contract of indebtedness, though discharged in bankruptcy, was not barred by limitation at the time the oral promise of 1877 was made. It was therefore capable of furnishing a good consideration for this new promise.

We have come back to this case and have gone over it anew, after such a delay as would enable our minds to receive fresh impressions of it. We have been unable to bring our minds to any substantial doubt, except upon the question whether the promise of 1877 was such an unconditional promise as would furnish a new cause of action. Upon that point the case is not as clear as we could wish. We believe, however, that our decision of that point is right upon purely legal grounds; but we have at least the satisfaction of knowing that if we have erred, we have erred in favor of the obvious justice of the case.

The motion for a rehearing is overruled. Judge BAKEWELL concurs ; Judge LEWIS is absent.